**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

TOMMY L. GIBSON,

                Plaintiff,

vs.                                           CASE NO: 2:10-cv-44-FTM-29SPC

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

_____

**REPORT AND RECOMMENDATION**

This matter comes before the Court on the Plaintiff, Tommy L. Gibson's, Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. # 1) filed on January 25, 2010, in the Middle District of Florida, Fort Myers Division.  The Plaintiff filed her Memorandum of Law in Support of the Complaint (Doc. #12) on May 28, 2010.  The Commissioner filed the Memorandum of Law in Support of the Commissioner's Decision (Doc. #15) on September 24, 2010.  Thus, the Motion is now ripe for review.

The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.  This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 42 U.S.C. § 405(g).

## FACTS

### *Procedural History*

The Plaintiff previously filed an application for a period of disability and disability insurance benefits on February 28, 2007, with an alleged onset date of disability of January 28, 2007. (Tr. 14). The claim was denied initially on July 10, 2007, and upon reconsideration on October 26, 2007. (Tr. 14). The Plaintiff filed a Request for Hearing. (Tr. 9-10). A hearing was held before the Honorable Ruben Rivera, Administrative Law Judge (ALJ), on June 4, 2009. (Tr. 23-37). On July 15, 2009, the ALJ issued an unfavorable ruling. The Plaintiff appealed that denial to the Appeals Council and on January 25, 2010, the Appeals Council denied request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4).[1] The Plaintiff has exhausted his administrative remedies, and this case is ripe for review under 42 U.S.C. § 405(g).

### *Plaintiff's History*

Plaintiff, who was born in 1954, was 55-years old when the ALJ rendered his decision. (Tr. 20, 24). Plaintiff graduated from high school and completed a year of college. (Tr. 111). He has prior work experience as a cashier and truck driver. (Tr. 117). Plaintiff alleged that he became disabled on January 28, 2007, due to diabetes, diabetic retinopathy, diabetic neuropathy, high cholesterol, a triple bypass procedure, 20/400 vision in the right eye, and other problems. (Tr. 98).

---

[1] There are two Notices of Appeals Council Action included in the record. (Tr. 1-4 and Tr. 5-8). The second Notice states that they were setting aside the earlier action to consider additional information, but again found no reason under their rules to review the ALJ's decision (Tr. 1-4).

### *Medical and Psychological History*

The Plaintiff began treating with Dr. Fernandez in March 2002.  Plaintiff said he suffered from diabetes since age 30.   Plaintiff said he had fallen at work and hurt his back and neck. He has had physical therapy. In April 2003, Dr. Fernandez stated Plaintiff had significant diabetic nephropathy with proteinuria.  Sugar control was good and getting better. Plaintiff had laser surgery on his left eye for his retinopathy. In November 2003, Plaintiff was seen by Dr. Fernandez who noted Plaintiff had recently been seen by his nephrologist. He noted his medication caused severe leg cramps and he had to quit it. Blood pressure was still elevated. Impression was pharyngitis, pulled teeth with mouth sores, diabetes mellitus with retinopathy, nepluopathy, proteinuria, renal insufficiency, and hypertension.

In October 2004, Plaintiff was seen by Dr. Fernandez after being hospitalized with an abnormal stress test and cardiac catheterization. Dr. Fernandez stated Plaintiff had triple vessel disease with 70-80% narrowing of the major vessels. Impression was coronary artery disease/multivessel disease fairly high grade with cardiac procedures and further evaluation pending; diabetes mellitus with associated retinopathy, nephropathy, and possible neuropathy; elevated cholesterol and triglycerides, hypertension and hyponatremia. (Tr. 448-61). These records were submitted to SSA by Plaintiff's attorney on June 16, 2009.  (Tr. 446).

The Plaintiff had a treadmill stress test in September 2004, because he was experiencing chest pain. The test was stopped because his legs became tired and he could not walk anymore. The test was submaximal with a maximum heart rate of 127 (target 145). (Tr. 206).

Between October 2004 and March 2005, the Plaintiff treated with Dr. Mueller, from HeartCare Midwest. In March 2005, Dr. Mueller stated Plaintiff complained of burning moderate chest pain which lasted several minutes, and occurred more with activity. Plaintiff

underwent a stress test followed with coronary catheterization, which demonstrated three vessel coronary artery disease. Past medical history was hypertension, diabetes, status post mediastinoscopy as an 18-year-old, left knee surgery, rotator cuff surgery, and hyperlipidemia. Dr. Mueller reviewed Dr. McRae's records wherein he recommended coronary artery bypass surgery. A coronary artery catheterization showed left anterior descending 75% stenosis, circumflex 80% stenosis, right coronary artery 75 to 80% stenosis. EKG was abnormal with first degree AV block, left axis deviation, and non-specific ST abnormality. Plan was CABG surgery. (Tr. 440-42). Dr. Mueller described Plaintiff's coronary disease as severe three vessel disease. (Tr. 443). These records were submitted to SSA by Plaintiff's attorney on June 5, 2009. (Tr. 437).

The Plaintiff had coronary artery bypass grafting surgery on March 14, 2005. (Tr. 216-217). At that time, he was checked for his renal problems and was diagnosed with acute chronic renal insufficiency secondary to diabetic nephropathy. (Tr. 218-24).

In May 2005, the Plaintiff saw Dr. Wang at Retina Consultants. Dr. Wang stated that the Plaintiff had laser treatment for his diabetic retinopathy over the past years and had to undertake three steroid injections in the right eye for diabetic retinopathy. Upon examination, Dr. Wang noted the optic nerve showed moderate pallor and there were some dilated vessels on the optic nerve. Impression was diabetic retinopathy with macular edema, diabetic retinopathy (left eye), partial PVD OU (both eyes), cataract OU (both eyes). (Tr. 261-62).

Dr. Sims treated the Plaintiff for his diabetic retinopathy from July 2005 to January 2009. In December 2008, the Plaintiff's eyesight was 20/400 in the right eye, 20/30 in the left eye with correction. (Tr. 383-96). These records were submitted to SSA by Plaintiff on May 14, 2009. (Tr. 382).

4

In November 2005, the Plaintiff was seen at Lee Memorial Health system after suffering a severe laceration to his right forearm after falling off a ladder.  His injury was described as almost a "degloving" injury. After undergoing sutures and stapling, which the physicians described as a complex procedure, Plaintiff then developed cellulitis.  Medical history included diabetes, hypertension, diabetic retinopathy, renal disease, and prostatic hypertrophy.  Diagnoses were wound abscess, cellulitis resolving, and possible hematoma versus seroma. (Tr. 331-33).

From December 2005 to July 2007, the Plaintiff was treated by Dr. Paul D. Mantell at Lee Physician Group. In December 2005, Dr. Mantell stated Plaintiff had arteriosclerotic heart disease but was asymptomatic; longstanding diabetes with renal problems including renal insufficiency, hyperlipidemia, hypertension with elevated blood pressure of 150, BPH, and anemia.  (Tr. 319-320).

In March 2006, the Plaintiff told Dr. Mantell that he had again fallen off a ladder, this time hurting his back.  The Plaintiff was feeling better but his back was miserable for a while; his diabetes control was not acceptable; his blood pressure was still too high; he again was diagnosed with renal insufficiency.  The doctor noted Plaintiff did not have insurance to cover his renal medications.  In June 2006, the Plaintiff's blood pressure remained on the high side; he had diagnosis of renal insufficiency, but had no symptoms from his arteriosclerotic heart disease; he complained of palpitations but his doctor thought they were benign.  Diagnoses were diabetes - reasonable control; blood pressure not controlled; lipids; and erectile dysfunction, mild.

In September 2006, Dr. Mantell said he wanted to lower the blood pressure further. Plaintiff's renal insufficiency had changed just a little and his diabetes was described as under excellent control. In January 2007, Dr. Mantell noted the Plaintiff did not get his blood work

done for his renal insufficiency because of a cost issue.   Blood pressure was 204/98. Diabetes was under control.  (Tr. 296-320).

The Plaintiff attended a Consultative Examination on June 15, 2007, at the request of the Office of Disability Determinations.   Dr. Berdick, the examining doctor, said the Plaintiff complained of dizziness, and stated "there was no history of retinopathy or nephropathy."  Dr. Berdick noted the Plaintiff had left knee surgery in 1987 and a benign lung biopsy in 1973.  Dr. Berdick noted right arm surgery in October 2005, for a laceration.   The physician stated there was no evidence of retinopathy, nephropathy, nor peripheral neuropathy.  (Tr. 273-74).

In July 2007,  Dr. Mantell listed diagnoses of (1) diabetic with nephropathy, retinopathy, and neuropathy indicating advanced diabetes; (2) quitting smoking would be helpful; (3) current medications included simvastatin, avalide, altace, uroxatral, glipizide, Aciphex, Citrucel.   The Plaintiff complained of severe fatigue and the doctor noted Plaintiff's renal insufficiency, especially diabetics, can become anemic.  (Tr. 294).

On July 24, 2007, Dr. Mantell wrote a letter "To Whom It May Concern" stating that Plaintiff had medical problems.   The Plaintiff had longstanding diabetes with neuropathy, nephropathy, and retinopathy.   The Plaintiff underwent extensive heart surgery in March 2005. The Plaintiff also had some accidents, one in which he fell off a ladder and injured his arm which remained scarred.  Dr. Mantell said the Plaintiff had been unable to work and was out of insurance.  Dr. Mantell said Plaintiff had multiple medical problems, and extensive medication needs in addition to blood work and others.  Dr. Mantell said the Plaintiff had hypertension, arteriosclerotic heart disease, hyperlipidemia, benign prosthetic hypertrophy with markedly decreased flow and urination which kept him up quite a bit at night despite medications.

On June 21, 2007, the Plaintiff was examined by Dr. Zsigmond at the request of Social Security.  Dr. Zsigmond listed the medical issues as type II diabetes, cardiac illness, right eye vision impairment, enlarged prostate, back and neck pain, and right arm numbness.   Dr. Zsigmond noted the Plaintiff had fatigue, limited stamina and dizziness due to his cardiac illness; frequent urination which disrupted his sleep due to diabetes and enlarged prostate; limited vision in the right eye due to diabetic retinopathy; and neck and back pain after a 2005 fall. The Plaintiff said he had permanent nerve damage in the right arm from the elbow down and would often drop items.  The Plaintiff also had kidney malfunction due to diabetes. The doctor noted activities of daily living were appropriate, but slow and painful. She stated the Plaintiff should obtain health insurance and resume appropriate medical care, and said Plaintiff would benefit from a psychiatric evaluation and counseling. She diagnosed Major Depressive Disorder, in addition to Type II Diabetes, cardiac illness, right eye vision impairment, enlarged prostate, back and neck pain, right arm numbness, hypertension, and  hyperlipidemia controlled.  She assigned a GAF of 56.[2]  (Tr. 275-77).

On July 3, 2007, a file-reviewing psychiatrist completed a Psychiatric Review Technique ("PRT") Form checking that the Plaintiff had 12.05 Affective Disorders and 12.06 anxiety-Related Disorders, with mild difficulties in Maintaining Social Functioning. (Tr. 280-93).

On July 24, 2007, the Plaintiff again saw Dr. Mantell who stated the Plaintiff did not have the energy to do things due to fatigue.  Bending and lifting had become more difficult. The Plaintiff said he got lightheaded and dizzy if he bent over.  The Plaintiff had mild shortness of

---

[2]  Global Assessment of Functioning ("GAF") of between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") 32 (American Psychiatric Assn, 1994).

breath at times. Dr. Mantell said Plaintiff had diabetic changes across the lower legs, with obvious neuropathy. The impression was diabetic with nephropathy, retinopathy, and neuropathy indicating advanced diabetes. (Tr. 463-64).

On October 22, 2007, a file-reviewing psychologist completed a PRT form. He checked that Plaintiff had 12.04 Affective Disorders, with mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace. (Tr. 350-63).

On October 24, 2007, the Plaintiff was seen at Lee Memorial Hospital ER feeling flushed and agitated with some vague chest pain. The final diagnoses were acute anxiety, chest pain, and chronic renal insufficiency. Plaintiff was told to follow up with Dr. Mantell as soon as possible. (Tr. 375-76).

On October 24, 2007, the Plaintiff was seen by Dr. Mantell for his complaints of exhaustion and GI problems. The physician diagnosed heat exhaustion, with Plaintiff feeling shaky, problems with the stomach, discomfort all over. Plaintiff also had an upper respiratory infection, with fatigue, malaise and weakness. Plaintiff also suffered from nausea, constipation, myalgias, dizziness, and tingling. His throat was erethemotous with scarring in both ear drums. (Tr. 432-36).

On October 25, 2007, a file-reviewing physician completed a Physical Residual Functional Capacity Assessment. The Plaintiff was found to be capable of: occasionally lifting 20 pounds, frequently lifting 10 pounds; Plaintiff could stand and/or walk about 6 hours in an 8-hour workday; could sit about 6 hours in an 8-hour workday. The Plaintiff was found to have limited visual acuity, depth perception, accommodation, color vision, and field of vision. No other limitations were checked. (Tr. 364-71).

On November 2, 2007, the Plaintiff saw Dr. Mantell for follow up on his blood pressure and emergency room follow up. The Plaintiff stated he was nervous and anxious. Examination was essentially normal. (Tr. 426-31).

On January 2, 2008, the Plaintiff saw Dr. Mantell for follow up for his hypertension, diabetes, lipids, and GERD. Plaintiff complained of fatigue and insomnia with blurred vision and eye pain. Plaintiff had leg swelling, neck pain, back pain, and joint pain. Plaintiff had neuropathic symptoms of tingling and sensory change in the feet. Plaintiff also complained of depression, and was nervous and anxious with insomnia. (Tr. 420-25).

On June 7, 2008, the Plaintiff saw Dr. Mantell for his hypetension, diabetes, lipids and GERD. Plaintiff complained of fatigue and headaches. He had leg swelling which comes and goes, and joint pain. He had tingling and sensory change as neurological symptoms. He said his depression was better - he said he could not afford the Effexor. He was anxious, nervous, and had insomnia. His renal insufficiency was stable. (Tr. 14-416). On July 31, 2008, Plaintiff saw Dr. Mantell for HTN, GERD, heart disease, and diabetes. He was at the doctor for follow-up for anxiety disorder and mood disorder. He also had paresthesias, racing thoughts, and sweating with difficulty concentrating, fatigue, and feelings of worthlessness/guilt and frequent loss of temper. He complained of fatigue. (Tr.408-13).

On December 12, 2008, Plaintiff saw Dr. Mantell for hypertension, GERD, heart disease, DM, and HTN. He reported malaise/fatigue, blurred vision; reported neck pain, back pain and joint pain. Exam showed decreased range of motion, tenderness and swelling in the right wrist; decreased range of motion, tenderness, swelling and deformity in the left wrist; decreased range of motion and tenderness in the right knee; decreased range of motion and tenderness in the left knee; tenderness and deformity in the right forearm. Renal functions continued to be abnormal

and "fairly marked." (Tr. 402-407). Plaintiff saw Dr. Mantell on April 10, 2009, for hypertension, GERD, arteriosclerotic heart disease, DM Type II, and hypertension. Plaintiff reported malaise/fatigue, headaches, said he had blurred vision, was experiencing shortness of breath, had heartburn and diarrhea, neck pain, back pain, and joint pain with severe spasms in the neck at times, had numbness in the feet due to neuropathy and had depression with nervousness and anxiousness. (Tr. 394-99).

On December 13, 2009, Dr. Mantell wrote a letter which was submitted to the Appeals Council. Dr. Mantell stated that he was surprised that Plaintiff was not qualified for Social Security Disability, and said Plaintiff had an overwhelming number of medical problems which made it very difficult for Plaintiff to do activities of daily living, let alone work. Dr. Mantell stated that Plaintiff had hyperlipidemia; he had hypertension with dizziness and lightheadedness; he had gastrointestinal reflux disease; he had arteriosclerotic heart disease and Dr. Mantell stated Plaintiff could be having silent ischemia, but Plaintiff could not afford specialist treatment or nuclear stress testing; Plaintiff had diabetes with multiple complications; he had chronic renal insufficiency that was at least stage III; he had diabetic neuropathy which made his gait, balance, and feeling more difficult - he noted Plaintiff had multiple accidents and falls and had a gait disorder. He also noted Plaintiff's poor vision; he had prostatic hypertrophy; he had chronic obstructive pulmonary disease although he continued to smoke; he had degenerative joint disease with arthritis; gait disorder; the doctor stated his poor vision affected his gait. He said Plaintiff also had depression and anxiety. Finally, Dr. Mantell stated "I cannot see him performing any meaningful work, whatsoever." (Tr. 470-71).

*Administrative Law Judge's Decision*

In the ALJ's Decision, the ALJ found Claimant meets insured status requirements of the Social Security Act through March 31,2012.  (Tr. 16, Finding 1). He found Claimant has not engaged in substantial gainful activity since January 28, 2007, the alleged onset date.  (Tr. 16, Finding 2).  The ALJ found the claimant had the severe impairments of diabetes mellitus, diabetic retinopathy, diabetic neuropathy and cardiac problems.  (Tr. 16, Finding 3). The ALJ found Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I (20 CFR 416.925 and 416.926) (Tr. 17, Finding 4). The ALJ found Claimant had the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 6 hours out of an 8 hour day, sit for 6 hours out of an 8 hour day, but is limited in near/far visual acuity, depth perception, accommodation, color vision, and field of vision.  (Tr. 17, Finding 5).  The ALJ found claimant capable of performing past relevant work as a cashier, work which the ALJ said does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  (Tr. 20, Finding 6). The ALJ found Claimant not under a disability as defined in the Social Security Act from January 28, 2007 through the date of the decision.  (Tr. 20, Finding 7).

## THE STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards,  and whether the findings are supported by substantial evidence. Hibbard v. Commissioner, 2007 WL 4365647 at *2 (M.D. Fla. December 12, 2007) (citing Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971); McRoberts v. Bowen, 841 F. 2d 1077, 1080 (11th Cir. 1988)).  In evaluating whether a Plaintiff is disabled, the

ALJ must follow the sequential inquiry described in the regulations.[3]   The Commissioner's findings of fact are conclusive if supported by substantial evidence.   42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion."   Hibbard, 2007 WL 4365647 at *2 (citing Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838–39 (11th Cir. 1982)); Richardson, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Phillips v. Barnhart, 357 F. 3d 1232, 1240 n.8 (11th Cir. 2004).   The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.   Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

---

[3]  The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability.  The steps are as follows:

   *Step 1*.  Is the claimant engaged in substantial gainful activity?  If the claimant is engaged in such activity, then he or she is not disabled.  If not, then the ALJ must move on to the next question.

   *Step 2*.  Does the claimant suffer from a severe impairment?  If not, then the claimant is not disabled.  If there is a severe impairment, the ALJ moves on to step three.

   *Step 3*.  Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, then the claimant is disabled.  If not, the next question must be resolved.

   *Step 4*.   Can the claimant perform his or her former work?  If the claimant can perform his or her past relevant work, he or she is not disabled.  If not, the ALJ must answer the last question.

   *Step 5*.  Can he or she engage in other work of the sort found in the national economy?  If so, then the claimant is not disabled.  If the claimant cannot engage in other work, then he or she is disabled.  See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).20 C.F.R. §§ 404.1520(a), 404.920(a).

The court  "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." <u>Phillips</u>, 357 F. 3d at 1240 n.8; <u>Dyer v. Barnhart</u>, 395 F. 3d 1206, 1210 (11th Cir. 2005).  If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. <u>Lewis v. Callahan</u>, 125 F. 3d 1436, 1439 (11th Cir. 1997).

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the case.  42 U.S.C. § 405(g)(sentence four).  The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  <u>Williams v. Commissioner</u>, 407 F. Supp. 2d 1297, 1299-1300 (M.D. Fla. 2005) (citing <u>Keeton v. Dep't of Health and Human Servs</u>, 21 F.3d 1064, 1066 (11th Cir. 1994)); <u>Cornelius v. Sullivan</u>, 936 F.2d 1143, 1145 (11th Cir. 1991).

## DISCUSSION

The Plaintiff argues the case should be remanded for the following reasons: (1) The ALJ erred when he relied on an opinion that could not have included all of the medical evidence of record and which erroneously stated that the record did not include evidence of retinopathy, nephropathy, or peripheral neuropathy in establishing the Residual Functional Capacity; (2) the ALJ's finding that the Plaintiff's mental impairment is not severe and causes no more than minimal limitation in ability to perform basic mental work activities is not based upon substantial evidence; (3) the ALJ erred in not requesting Vocational Expert testimony at the hearing, in light of the Plaintiff's visual limitations and mental impairments; and (4) new evidence properly presented to the Appeals Council renders the denial of benefits erroneous, shows that the ALJ's decision is not supported by substantial evidence, and requires that the case

be remanded for proper consideration of the evidence.   The Commissioner argues the ALJ's decision was supported by substantial evidence and should be affirmed.

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505.   The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

### (1) Whether the ALJ Erred When Making His Residual Functional Capacity Determination

The Plaintiff argues that the ALJ erred in his Residual Functional Capacity assessment at Step 4 when the ALJ relied upon a medical opinion that could not have considered all of the medical evidence.   The Plaintiff relies on 20 C.F.R. § 404.1545(a) to support his argument.   The Commissioner argues that the ALJ properly considered all relevant evidence and substantial evidence supports the ALJ's Residual Functional Capacity determination.

"The residual functional capacity (RFC) is an assessment which is based upon all of the relevant evidence of a claimant's remaining ability to do work despite his impairments.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) citing 20 C.F.R. § 404.1545(a).   The residual functional capacity determination is for the ALJ to make, and it is the ALJ who must consider all of the relevant evidence.   See id.; see also 20 C.F.R. § 404.1545(a) (referring to the ALJ, it states, "We will assess your residual functional capacity based on all the relevant evidence in your case record.").   There is no requirement that a treating or non-treating physician's report be made only after considering all medical evidence in the record.   Likewise, the ALJ is not

forbidden from considering a medical evaluation simply because the doctor did not have access to medical evidence that was submitted two years after the evaluation.  As long as the ALJ considers all the "relevant evidence" and substantial evidence supports his determination, there is no error on the part of the ALJ.  See Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (holding that there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as it is clear that the ALJ considered the Plaintiff's medical condition as a whole).

In this case, the ALJ did not err in considering the reports of Dr. Berdick,[4] and Dr. Ponterio,[5] even though their reports were completed prior to the Plaintiff submitting reports by Dr. Sims[6] on May 14, 2009, Dr. Mueller[7] on June 5, 2009, and Dr. Fernandez[8] on June 16, 2009. The ALJ is required to consider all relevant evidence that appears in the record, but this requirement is not applied to doctor's whose reports are considered by the ALJ.  The fact that a doctor's diagnosis was given prior to another doctor reviewing the case years later does not prohibit the ALJ from using that initial diagnosis.  The ALJ must review the relevant medical record as a whole not simply the last doctors who saw or reviewed the claimant's record.  Lewis,

---

[4] Dr. Berdick completed an in-person exam of the Plaintiff on June 15, 2007, and his report was completed on June 25, 2007.  (Tr. at 273-74).

[5] Dr. Ponterio completed his RFC Form on October 25, 2007.  (Tr. at 364-71).

[6] Dr. Sims treated the Plaintiff from July of 2005 to January of 2009.  Plaintiff did not submit the files to SSA for consideration until May 14, 2009.  (Doc #12 at 5).

[7] Dr. Mueller treated the Plaintiff from October of 2004 to March of 2005.  Plaintiff did not submit the files to SSA for consideration until June 5, 2009.  (Doc #12 at 4).

[8] Dr. Fernandez treated the Plaintiff in March of 2002.  Plaintiff did not submit the files to SSA for consideration until June 15, 2009.  (Doc #12 at 4).

125 F.3d at 1440.  Furthermore, it is the Plaintiff's responsibility to provide all the evidence necessary to the ALJ to allow him to make an RFC determinations.  20 C.F.R. § 404.1545(a)(3).

In Dr. Berdick's report, he indicated the Plaintiff showed no history of retinopathy, nephropathy, or peripheral neuropathy.  (Tr. 273).  The Plaintiff correctly states that there was other medical evidence in the record at that time to show Plaintiff was suffering from those conditions.  Therefore, Plaintiff asserts the ALJ's RFC determination cannot be based on substantial evidence because he relied upon Dr. Berdick's report.  This Court finds that even though Dr. Berdick found that Plaintiff showed no history of retinopathy, nephropathy, or peripheral neuropathy, the ALJ did consider, and in fact concluded, that the Plaintiff suffered from retinopathy, neuropathy, and nephropathy.  (Tr. 16, 19).  This was also indicated in the ALJ's Step 4 conclusion  where the ALJ indicated a limitation to his RFC determination:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 6 hours our of an 8 hour day, sit for 6 hours out of an 8 hour day **but is limited in near/far visual acuity, depth perception, accommodation, color vision and field of vision.**

(Tr. 17) (emphasis added).

Turning to Dr. Ponterio's report, he completed an RFC form based upon all medical evidence submitted to the Commissioner prior to October 25, 2007.  Plaintiff asserts the ALJ erred in his RFC finding because he relied on Dr. Ponterio's report which "correctly noted" the Plaintiff's impairments, but it failed to consider evidence which was submitted by Plaintiff about seventeen months after Dr. Ponterio completed his report.  Clearly Dr. Ponterio could not have relied upon evidence submitted seventeen months after his report.  In that instance, Plaintiff knew he submitted new records which were not considered by Dr. Ponterio, or even Dr. Berdick.  As in all Social Security disability cases, the Plaintiff bears the ultimate burden of proving

16

disability, and is responsible for furnishing or identifying medical and other evidence regarding his impairments.  Bowen v. Yuckert, 482 U.S. 137,146 n. 5 (1987); Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991); McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Griffis v. Astrue, 619 F. Supp. 2d 1215, 1218 (M.D. Fla. 2008).  The Plaintiff had the ability to have an RFC assessment completed by one of his treating doctors which could have taken into account the documents submitted in 2009.  See Lee v. Astrue, 2009 WL 1393503 (M.D. Fla. 2009).

Although the above reports were completed prior to the submission of relevant evidence, nothing in the record indicates that Dr. Berdick's or Dr. Ponterio's records were unreliable, and the ALJ did in fact consider the Plaintiff's retinopathy, neuropathy, and nephropathy in making his RFC determination.  Therefore, it is respectfully recommended that the ALJ did not err in his RFC assessment.

(2). _Whether the ALJ Erred in Failing to Find the Plaintiff's Mental Impairments "Severe"_

The Plaintiff argues the ALJ failed to find that Plaintiff's depression and chronic adjustment disorder with anxiety were severe mental impairments.  The Commissioner argues that contrary to Plaintiff's contentions, substantial evidence supports the ALJ's finding that he did not have a severe mental impairment.

At Step 2, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe."  An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  Basic work activities include, for example: (1) physical functions such as walking and standing; (2) capacities for seeing, hearing, and speaking; (3) understanding, following, and remembering simple instructions; (4) using judgment; (5) responding appropriately to supervision, co-workers, and normal work situations; and (6) dealing with

changes in the work setting.  20 C.F.R. § 404.1521(b).  "An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, regardless of age, education, or work experience."  Bridges v. Bowen, 815 F.2d 622,625 (11th Cir. 1987).

At Step 2 of the sequential evaluation process, the ALJ found that the Plaintiff had the following severe impairment: diabetes mellitus, diabetic retinopathy, diabetic neuropathy, and cardiac problems.  (Tr. 17).  The ALJ stated that the Plaintiff's medically determinable[9] mental impairment of depression "does not cause more than minimal limitation in the claimant's ability to perform mental work activities and is therefore nonsevere."  (Tr. 18).  In coming to this conclusion, the ALJ considered the effect of the above mental impairment on four broad functional areas, also known as "paragraph B" criteria, set out in the regulations for evaluating mental disorders.  20 C.F.R. Pt. 404, Subpart P, App. 1.

Evaluating mental impairments in each of four functional areas will reveal the extent to which the impairments interfere with the claimant's ability to function "independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § 404.1520a(c)(2).  The four broad functional areas are: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 404.1520a(c)(4).  When rating the degree of limitation in the first three categories, the ALJ will use a five-point scale: none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a(c)(4).  When rating the degree of limitation in the fourth category, the ALJ will use a four-point scale: none, one or two,

---

[9] Diagnosis of a condition does not proved that the condition affected the claimant's ability to perform basic work activities.  Moore v. Barnhart, 405 F.3d 1208, 1213 n.3 (11th Cir. 2005); see alsoGross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss.").

three, and four or more.  20 C.F.R. § 404.1520a(c)(4).  If the limitation in the first three function areas rates at "none" or "mild," and the fourth area rates at a "none," then the ALJ will generally conclude that the claimant's impairments are not severe, unless "the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities."  20 C.F.R. § 404.1520a(d)(1).

The ALJ found the Plaintiff suffered from no limitations to "activities of daily living," mild limitation to "social functioning," mild limitation to "concentration, persistence or pace," and no episodes of decompensation.  (Tr. 18).  A Psychiatric Review Technique, filled out on October 22, 2007, by Dr. Timothy Foster, indicated identical functional limitations as the ALJ.  (Tr. 350–63).  In this report, Dr. Foster concluded, "I am not finding severe functional limits from mental at this time."  (Tr. 362).  He also concluded there was no evidence of psychosis or suicidal ideation, Plaintiff's memory was adequate, and thinking is logical and coherent.  (Tr. 362).

A Psychiatric Review Technique filled out by Dr. Arthur Hamlin, on July 3, 2007, concluded that Plaintiff's mental impairment had less of a functional impact than the ALJ found.  He concluded Plaintiff had no limitation to "activities of daily living," mild limitation to "social functioning," no limitation to "concentration, persistence or pace," and no episodes of decompensation.  (Tr. 280–93).  Dr. Hamlin found no mental abnormalities, and all mental impairments were non-severe.  (Tr. 292).

Plaintiff claims the ALJ ignored much of the Consultative Psychological Examination conducted by Dr. Zsigmond.  This Court concludes Dr. Zsigmond's report substantially supports the ALJ's findings.  The ALJ also considered the a general clinical evaluation with mental status

performed by Dr. Claudia Zsigmond on June 21, 2007. The ALJ's decision regarding Dr.

Zsigmond's report reads in pertinent part:

> The claimant reported complaints of depression and anxiety beginning in 2005 following a triple cardiac by-pass that was successful. On general observations, the Plaintiff claimant drove himself to the appointment but admitted that he drove on a limited basis due to a right eye vision impairment. He was appropriately dressed and groomed with good basic functioning hygiene. He had no prominent gait abnormalities or gross motor coordination problems. On mental status examination, the claimant appeared well oriented with no symptoms of psychosis, suicidal, or homicidal tendencies. He exhibited good recall of recent and remote events that suggested no severe short-term or long[-]term memory impairment. Thought processes were logical and coherent and he appeared in no acute mental distress.

(Tr. 18).

When doing her evaluation, Dr. Zsigmond made general observations of the Plaintiff,

evaluated his mental status, and looked at his daily functioning and activities. In Dr. Zsigmond's

evaluation of Plaintiff's functioning and daily activities she concluded he possessed an adequate

ability to handle his own funds. (Tr. 277). His average day consisted of watching television,

doing small home repairs, and light housecleaning. (Tr. 277). She concluded his activities of

daily living were appropriate, however slow and painful at times, but there was no indication this

was caused by any mental impairment. (Tr. 277).

Dr. Zsigmond's prognosis for the Plaintiff was fair with appropriate services. (Tr. 277).

She recommended the Plaintiff obtain health insurance and resume appropriate medical care.

She also recommended a psychiatric evaluation and individual counseling to enhance coping

skills. (Tr. 277). She diagnosed the Plaintiff with major depressive disorder, single episode,

moderate, chronic with adjustment disorder with anxiety.  (Tr. 277).  Dr. Zsigmond also assessed the Plaintiff with a present GAF score of 56.[10]

Nothing in Dr. Zsigmond's report indicates or implies the Plaintiff's mental impairment would substantially impair his ability to perform basic work activities.  The ALJ considered the whole report and this report supports the ALJ's conclusion.

To make his finding, the ALJ properly considered the Plaintiff's medically determinable mental impairment of depression.  The ALJ found that the mental impairment "did not cause more than minimal limitations in the claimant's ability to perform basic mental work activities and is therefore nonsevere."  (Tr. 16).  Further, there is no evidence that otherwise indicates that there is more than a minimal limitation in the Plaintiff's ability to do basic work activities.  This Court recommends a finding that there is substantial evidence in the record to support the ALJ's finding at Step 2.

### (3) *Whether the ALJ Erred by Not Requesting Vocational Expert Testimony at the Hearing*

The Plaintiff argues the ALJ erred by not calling a Vocational Expert to evaluate whether the Plaintiff's non-exertional limitations would affect his ability to perform a full range of employment.  The Commissioner argues that there is no requirement for the ALJ to call a vocational expert because the ALJ decided this case at Step 4 and is not required to call a vocational expert until Step 5.

---

[10] A GAF (global assessment of functioning) score of 56 indicates moderate psychological symptoms. Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., Text Rev. 2000).  Courts use the GAF score as evidence of the severity of a mental impairment, but it is not used as a definitive indicator of severe mental impairments.  See Kornecky v. Comm'r of Soc. Sec., 167 Fed. Appx 496, 511 (6th Cir. 2006) ("We are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place. . . . If other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to the claimant whose GAF score is as low as [50] or even lower." (citations omitted)).

The fourth step of the evaluation process "assesses the claimant's residual functional capacity (RFC) and measures whether a claimant can perform past relevant work despite his or her impairment.  Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002), citing 20 C.F.R. § 404.1520(f).  The plaintiff bears the burden of proving the inability to perform his or her previous work.  Lucas v. Sullivan, 918 F.2d 1567, 1571 (11th Cir. 1990).  The plaintiff must show the inability to do the previous type of work, not merely the specific job he or she held.  Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir. 1986).  "Social Security Ruling 82-61 provides that a [plaintiff] can return to past relevant work if [he] can perform the specific job [he] performed, either in the manner [he] performed it, or as it is usually performed in the national economy."  Dudley v. Apfel, 75 F. Supp. 2d 1381, 1382 (N.D. Ga. 1999), citing S.S.R. 82-61.  The RFC assessment must include non-exertional limitations if the medical evidence reveals there is a non-exertional impairment that would affect the Plaintiff's ability to work.  Vesy v. Astrue, 353 Fed. Appx. 219, 223 (11th Cir. 2009).

In this case, the ALJ determined the Plaintiff was not disabled at Step 4 of the five-step analysis. As a result of his RFC analysis, the ALJ found the Plaintiff is capable of performing past relevant work as a cashier because "this work does not require the performance of work-related activities precluded by the claimant's residual functional capacity."  (Tr. 20).  However, the ALJ's determination that the Plaintiff could perform the purely physical aspects did not consider the Plaintiff's visual impairments.  The ALJ's opinion shows no evidence that the ALJ considered the impact of non-exertional impairments—visual impairments—on the Plaintiff's ability to perform his past relevant job.

In the ALJ's RFC, he found the Plaintiff was able to "lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 6 hours out of an 8 hour day, sit for 6 hours out of an 8

hour day." (Tr. 17). The record indicates the ALJ made his findings based on the physical ability of the Plaintiff, and failed to consider and evaluate the Plaintiff's abilities in light of his severe visual impairment. See 20 C.F.R. § 404.1545(d) ("[I]mpairments of vision . . . may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment[], we consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity."). The Physical RFC, done by Dr. Albert Ponterio, concluded the Plaintiff has the physical abilities as noted by the ALJ and stated the Plaintiff was visually limited as to near acuity, far acuity, depth perception, accommodation, color vision, and field of vision. (Tr. 367). Although the ALJ noted the same visual limitations in his RFC, there is no evidence in his opinion indicating he considered those limitations in his decision that the Plaintiff can do past relevant work, despite a finding at Step 2 that the Plaintiff's diabetic retinopathy was a severe impairment.

The ALJ should have made findings of fact concerning the demands of the job and how the Plaintiff's impaired vision would affect the Plaintiff's ability to do the job. Without making these findings the ALJ is unable to conclude the Plaintiff can perform his past relevant work despite his physical and visual impairments. The ALJ's conclusion that the claimant is capable of performing past relevant work as a cashier did not consider the effect of his visual impairment on his ability. Therefore, this Court respectfully recommends this case be remanded to the Commissioner for step-five analysis including the consultation with a vocational expert. See Phillips, 357 F.3d at 1242 (holding that a vocational expert is required when the Plaintiff is unable to perform a full range of work at a given RFC level, or when the Plaintiff has a non-exertional impairment that significantly limits basic work skills).

*(4) Whether New Evidence Presented to Appeals Council Warrants Remand to ALJ*

On December 18, 2009, the Appeals Council informed the Plaintiff that his request for review was denied.  The Plaintiff submitted "new" evidence in the form of a letter written by Dr. Paul Mantell on December 13, 2009.  On January 25, 2010, the Appeals Counsel informed the Plaintiff they had set aside their first denial, considered the new evidence, and denied the Plaintiff's second request for review.

This evidence fails for remand under sentence four of 42 U.S.C. § 405(g) even when considering the new evidence properly presented to the Appeals Council.  "A federal district court must consider evidence not submitted to the [ALJ] but considered by the Appeals Council when that court reviews the Commissioner's final decision denying Social Security benefits." Ingram v. Commissioner, 496 F.3d 1253, 1258 (11th Cir. 2007).  The Court continued, "[w]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." Id. at 1262.

The new evidence in question is a letter by Dr. Paul Mantell dated December 13, 2009.  (Tr. 470).  This evidence was not available at the time the ALJ made his ruling, thus was not considered by the ALJ.  This Court finds the new evidence to be nothing more than a restatement of the doctor's previous opinions which were properly considered by the ALJ, and an outline of the Plaintiff's history of his illnesses.  First, the doctor states the Plaintiff has done a fairly good job with his hyperlipidemia.  The hypertension and dizziness resulting from the hypertension was already considered in the ALJ's decision.  (Tr. 16).  The doctor stated the Plaintiff's gastrointestinal reflux disease was well controlled with medicine.  (Tr. 470).  The Plaintiff's arteriosclerotic heart disease is not resulting in any active angina at the time of the letter.  (Tr. 470).  The doctor stated the Plaintiff's diabetes and multiple complication were resolved and

24

reasonably well controlled through diet.  (Tr. 470).  The Plaintiff's chronic renal insufficiency was modestly advanced, but the doctor was not able to state this conclusively as he had not conducted the required tests.   (Tr. 470).   The Plaintiff deals with his benign prostatic hypertrophy fairly well through medication.   The doctor did not think the Plaintiff was physically active enough for his chronic obstructive pulmonary disease to become symptomatic, and it does not help that the Plaintiff continues to smoke.  (Tr. 470).  Contradictory to number 11 in the letter, number 7 states the Plaintiff's gait disorder is resolved.  (Tr. 470).  Although admittedly not an ophthalmologist, the doctor also mentions the Plaintiff's retinopathy and how it may affect his physical functioning.  (Tr. 470-71).

Finally, the depression and anxiety had been considered and evaluated through three different medical opinions in the ALJ's decision.  First, a Psychiatric Review Technique, filled out on October 22, 2007, indicated identical functional limitations as the ALJ.  (Tr. 350–63).  In this report, Dr. Timothy Foster stated, "I am not finding severe functional limits from mental at this time." (Tr. 362).  He also concluded there was no evidence of psychosis or suicidal ideation, Plaintiff's memory was adequate, and thinking was logical and coherent.  (Tr. 362).  Second, a Psychiatric Review Technique filled out by Dr. Arthur Hamlin, on July 3, 2007, concluded the Plaintiff's mental impairment had less of a functional impact than the ALJ found.  He concluded Plaintiff had no limitation to "activities of daily living," mild limitation to "social functioning," no limitation to "concentration, persistence or pace," and no episodes of decompensation.  (Tr. 280–93).  Dr. Hamlin found no mental abnormalities, and all mental impairments were non-severe.  (Tr. 292).  Lastly, nothing in Dr. Zsigmond's report indicates or implies the Plaintiff's mental impairment would substantially impair his ability to perform basic work activities.  The ALJ considered the whole report and this report supports the ALJ's conclusion.

In consideration of the new evidence properly presented to the Appeals Council, this Court recommends this new evidence does not materially alter the ALJ's decision. The Appeals Council considered this letter and correctly concluded that it did not provide a basis for changing the ALJ's decision.

Accordingly it is hereby

**RESPECTFULLY RECOMMENDED:**

The Final Decision of the Commissioner of Social Security Denying the Plaintiff's Claim for Disability Insurance dated July 15, 2009, should be **REMANDED** pursuant to 42 U.S.C. § 405(g) sentence four for a determination by a Vocational Expert as to whether the Plaintiff's visual impairments prevent him from obtaining substantial gainful employment.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RESPECTFULLY RECOMMENDED** at Fort Myers, Florida, this _6th_ day of January, 2011.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: Counsel of Record, MJCD

26